UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
:
JASON W. KOREN, :
:
       Plaintiff, : CASE NO. 1:11-CV-2674
:
   v. :
: OPINION & ORDER
THE OHIO BELL TELEPHONE : [Resolving Doc. No. 25]
COMPANY, :
:
       Defendant. :
:
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

In this case, Defendant The Ohio Bell Telephone Company fired Plaintiff Jason W. Koren after Koren missed work for his father's funeral. Koren (who suspects Ohio Bell really fired him because he's homosexual and took his husband's last name) now brings gender-discrimination and disability-discrimination claims against Ohio Bell. Ohio Bell has moved for summary judgment, [Doc. 25], and Koren has filed an opposition to that motion, [Doc. 27]. For the following reasons, the Court **DENIES** Ohio Bell's motion for summary judgment.

**I.**

*A. 2000-2006: Koren's First Employment with Ohio Bell*

Jason Koren was first employed at Ohio Bell[1] from 2000 to 2006, and had climbed the

---

[1] Some documents indicate that Koren was employed by AT&T, an affiliate of Ohio Bell. The correct defendant in this case is Ohio Bell, not AT&T. *See* [Doc. 12 (Order granting stipulated motion to correct the Defendant's name to Ohio Bell)]. Accordingly, the Court shall refer to the Defendant only as Ohio Bell.

-1-

Case No. 1:11-CV-2674
Gwin, J.

employment ranks to a manager position. During these years of employment, Koren's legal name (and the name he went by) was Jason Cabot. Koren's co-workers all knew that he was homosexual, including fellow manager Kim Miceli—she and Koren had "a good working relationship." [Docs. 25-3 at 1; 24-1 at 12; 27-2 at 24].

Koren claims that prior to ending his first employment with Ohio Bell, he had made it known to his co-workers that he had been suffering from AIDS. (Some of Koren's co-workers deny that they had knowledge of Koren's condition in 2006.[2/]) Koren left Ohio Bell in 2006; he believed that he left on "good terms." [Doc. 24-1 at 5].

### B. 2009: Koren's Second Employment with Ohio Bell

On December 31, 2008, Koren got married in Massachusetts and took the name of his husband. Ohio Bell rehired Koren on June 8, 2009, as a sales consultant (a "Limited Term" employee position), and after he was rehired Jason Cabot legally changed his name to Jason Koren. [*Id.* at 3-5].

Prior to being assigned to a sales floor, Koren completed three months of company training. Although the first few days proceeded without incident, Koren says that things changed after the trainer learned about his background—and his sexual orientation. [*Id.* at 6]. Koren says that he was stereotyped and that attention was brought to the fact that he had changed his name by awarding him two training completion certificates: one as Jason Koren and then, immediately afterwards, one as Jason Cabot. [*Id.* at 6-7].

After training, Koren was assigned to a sales floor. Koren says that he was immediately treated unfairly by being initially denied a Sales Coach. [*Id.* at 8-9]. However, after "[r]oughly three

---

[2/]*See* [Docs. 25-3 at 4; 25-2 at 3; 24-2 at 4].

-2-

Case No. 1:11-CV-2674
Gwin, J.

or four weeks," Koren was assigned to Sales Coach Anitra Bailey. [*Id.* at 9]. Bailey reported to the Call Center Sales Manager, James Tench, who was a co-worker of Koren's during the 2000-2006 employment stint. Miceli, as the Call Center Attendance Manager, was also Koren's superior. Both Miceli and Tench reported to the General Manager, Scott Willis, who had never met Koren.

Koren has other complaints about the way that he was treated during his second employment at Ohio Bell: (1) not being allowed to lead team meetings; (2) having a customer's positive recommendation posted on the bathroom urinal wall rather than in the hallway with other recommendations; and (3) being denied access to an intranet pin that would allow him to view Ohio Bell job postings for managerial positions.

Koren also says that his relationship with Miceli took a turn for the worse once he was assigned to a sales floor. Koren says that Miceli began calling him Cabot, and he told her that was no longer his name and he preferred Jason or Mr. Koren. Then, according to Koren, Miceli told him that she would continue to call him Cabot because she refused to recognize his marriage or his name change. After that, Miceli would go out of her way to refer to him as Cabot. Although Miceli claims that she does not recall a conversation in which Koren informed her that he would like to be called Cabot, she admits that it may have occurred. Regarding same sex marriages, Miceli says that she "would never say that [she] would not recognize anything like that." [Doc. 27-2 at 22].

Koren filed a union grievance against Miceli because she called him Cabot. Miceli claims that she settled the grievance by agreeing to call him Mr. Koren, but Koren says that Miceli called him Cabot "up until the day [he] left." [Doc. 24-1 at 14].

When he worked for Ohio Bell the second time, Koren says that he needed no additional accommodations relating to the fact that he had AIDS. Koren did, however, take medicine that could

Case No. 1:11-CV-2674
Gwin, J.

require more frequent bathroom breaks.  Pursuant to Miceli's instructions and Ohio Bell's company policies, Koren produced a medical note to cover these frequent bathroom breaks in case they were to occur at work.

### C.  Koren's Absences

In September 2009, Koren's father passed away; as a result, Koren missed nine days of work. Pursuant to Miceli's instructions, Koren called off work each of the nine days he was absent.  During the time he was away from work, Koren also kept in contact with his union benefit representative, Colleen Moughan.  Koren claims that Moughan informed him that he would get excused time off for the funeral.  [*Id.* at 20].

Ohio Bell's Collective Bargaining Agreement indicated which employees were entitled to excused bereavement time off.  *See* [Doc.25-6].  Miceli reviewed the Collective Bargaining Agreement and determined that Koren had not been with Ohio Bell long enough to be entitled to any excused bereavement days.  But after consulting with Tench and the legal department, Miceli decided Koren was entitled to two excused, unpaid bereavement days.  [Doc. 25-3 at 2].

In the end, Ohio Bell assessed Koren with seven unexcused absences.  On October 5, 2009, Koren's Sales Coach, Anitra Bailey, signed the document placing Koren on Final Written Warning, in accordance with Ohio Bell's attendance policy.  [Doc. 25-8 at 1].  This warning carried no further discipline, and "Koren was eligible to be removed from Final Written Warning on March 30, 2010 if he complied with the [Attendance] Policy."  [Doc. 25-2 at 2-3].

### D.  Koren's Termination

On October 23, 2009, Ohio Bell sent a letter to the employee's union confirming an agreement to "convert" certain employees who had a "satisfactory rating in performance and

-4-

Case No. 1:11-CV-2674
Gwin, J.

attendance" to "Regular Full Time Sales Consultants." *See* [Doc. 25-10]. The conversion applied to employees in Limited Term positions who had been hired in 2009, including Koren. However, Ohio Bell would terminate limited Term employees with "an unsatisfactory rating in performance and/or attendance." [*Id.*]. Scott Willis, after conferring with Ohio Bell's Labor and Human Resources Departments, determined that the cut-off for satisfactory attendance rating would be four unexcused absences. [Doc. 25-5 at 2]. Neither Tench, Miceli, nor any other managers from Koren's call center were involved in the decision to terminate Limited Term employees with four or more absences. [Docs. 25-5 at 2; 25-3 at 4; 25-2 at 3]. Because of his seven unexcused absences, Koren was not converted to a regular sales consultant; Ohio Bell terminated him on October 30, 2009. [Doc. 25-5 at 3].

*E. Procedural History*

Koren brought this case against Ohio Bell, asserting four causes of action: (1) discrimination in violation of the Americans with Disabilities Act; (2) disability discrimination in violation of the Ohio Civil Rights Act (OCRA); (3) gender discrimination in violation of Title VII of the Civil Rights Act of 1964; and (4) gender discrimination in violation of the OCRA. Ohio Bell has moved for summary judgment on all of Koren's claims and argues that Koren's termination was unrelated to his disability, that there is no evidence that Koren's termination was based on his gender, and that Koren's termination was based on legitimate, nondiscriminatory reasons. *See* [Doc. 25].

**II.**

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. 56(a). The moving party bears the initial burden to show the absence

Case No. 1:11-CV-2674
Gwin, J.

of a genuine dispute of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). This burden is met by showing the court that there is an absence of evidence on a material fact on which the nonmoving party has the ultimate burden of proof at trial. *Id.* at 325. The burden then shifts to the nonmoving party to "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). It is not sufficient for the nonmoving party merely to show that there is some existence of doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In deciding a motion for summary judgment, the Court "considers the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of the nonmoving party." *Lenscrafters, Inc. v. Robinson*, 403 F.3d 798, 802 (6th Cir. 2005) (citations omitted).

### III.

*A. Disability Discrimination*

Ohio Bell first argues that it is entitled to summary judgment on Koren's federal and state-law disability-discrimination claims because Koren cannot establish that Ohio Bell had knowledge of Koren's disability.[3]

For Koren to establish his prima facie Americans with Disabilities Act discrimination claim through indirect evidence, he must establish that, among other things, "the employer knew or had reason to know of the [his] disability . . . ."[4] *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir.

---

[3] "[R]egulations and cases interpreting the [Americans with Disabilities Act provide] guidance in [interpreting] Ohio law," *City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 207 (Ohio 1998), and disposition of Ohio Bell's motion for summary judgment on Koren's federal disability discrimination claim will also settle the motion on Koren's state disability claim.

[4] Koren does not allege that he has direct evidence of either disability or gender discrimination. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) (Direct "evidence would take the form, for example, of an employer telling an employee, 'I fired you because you are disabled.'")

-6-

Case No. 1:11-CV-2674
Gwin, J.

2011) (internal quotation marks omitted). Ohio Bell argues that Koren cannot satisfy this element "because no decision maker with respect to the decision to end his employment knew that he had AIDS." [Doc. 25 at 10].

Koren does not argue that Scott Willis had knowledge of his condition; rather, he argues that Willis terminated him in reliance on information coming from Tench and Miceli, who were aware of his condition.[5] [Doc. 27 at 7]. Recall, it was Miceli's decision to assess Koren with seven absences: Koren suggests that Miceli did not fairly evaluate his situation and points out that Moughan, the union representative, often had to appeal to Miceli's supervisors to intervene because Miceli treated employees differently based upon her personal feelings about them. [Doc. 27-4 at 9].

Miceli and Tench dispute that fact and maintain that they were unaware of Koren's AIDS diagnosis. But what is undisputed is that Miceli and Tench worked with Koren during his first employment period with Ohio Bell, and Koren testified that he "had advised his coworkers of his status as . . . being diagnosed with AIDS in 2006." [Doc. 24-1 at 4]. Furthermore, the reasonable inference from the fact that Miceli required Koren to produce a medical note regarding his extra bathroom breaks, [Id. at 14], supports Koren's claim that Miceli knew he had AIDS.

In the end, this is a question of credibility—it's Koren's word versus Tench's and Miceli's. And because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," *V & M Star Steel v. Centimark Corp.*,

---

[5] Koren relies upon a "cat's paw" theory in which "the ultimate decisionmaker's exercise of judgment [does not] automatically render the link to the supervisor's bias remote or purely contingent." *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192 (2011). In *Staub*, the Supreme Court noted that multiple supervisors are often the proximate cause of "the ultimate decision" to "reward, punish, or dismiss" an employee. *Id.* Miceli and Tench were supervisors who completed "performance assessments" and made attendance decisions upon which "the ultimate decision" to terminate Koren was based. *Id.* at 1192-93. Accordingly Koren can support the fourth element if Miceli or Tench has knowledge of his disability. See *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 836 (6th Cir. 2012) (applying *Staub* to a Title VII claim).

Case No. 1:11-CV-2674
Gwin, J.

678 F.3d 459, 470 (6th Cir. 2012) (citation and internal quotation marks omitted), Ohio Bell has not "show[n] that there is no genuine dispute as to any material fact," and is not "entitled to judgment as a matter of law" on Koren's disability-discrimination claims. Fed. R. Civ. P. 56(a).

### B. Gender Discrimination

Ohio Bell also argues that it is entitled to summary judgment on Koren's federal and state-law gender-discrimination claims. According to Ohio Bell: (1) Koren has no evidence that he was terminated because of his sex; and (2) it fired Koren fired for a legitimate, nondiscriminatory reason, without evidence of pretext.[6]

1. Termination Because of Sex

Title VII of the Civil Rights Act of 1964 provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . [his] sex . . . ." 42 U.S.C. § 2000e-2(a).

Koren's theory is that "[Ohio Bell] has discriminated against [Koren] because [Koren] failed to conform to gender stereotypes." [Doc. 1 at 6]; *see Smith v. City of Salem, Ohio,* 378 F.3d 566, 574 (6th Cir. 2004) ("It follows [from *Price Waterhouse*] that employers who discriminate against men because they . . . act femininely are also engaging in sex discrimination, because the discrimination would not occur but for the victim's sex."). That *is* a claim of discrimination because of sex. And Koren has evidence that Ohio Bell discriminated against him because Koren took his husband's last name—failing to conform with the male stereotype.

---

[6] The Court's analysis of Koren's Title VII claims is also applicable to his Ohio state-law claims. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n,* 421 N.E.2d 128, 131 (Ohio 1981) ("[F]ederal case law interpreting Title VII . . . is generally applicable to cases involving alleged violations of [O.]R.C. Chapter 4112.").

Case No. 1:11-CV-2674
Gwin, J.

"[A] plaintiff hoping to succeed on a claim of sex stereotyping [must] show that he fails to act and/or identify with his or her gender, . . . as all homosexuals, by definition, fail to conform to traditional gender norms in their sexual practices." *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 764 (6th Cir. 2006) (internal quotation marks omitted) ("Later cases applying *Price Waterhouse* have interpreted it as applying where gender non-conformance is demonstrable through the plaintiff's appearance or behavior.") Koren's position is that changing his name upon marriage was a non-conforming "behavior" that supports his gender discrimination claim under a *Price Waterhouse* sex-stereotyping theory. Ohio Bell disagrees and attempts to frame Koren's claims as a simple attempt "to bootstrap protection for sexual orientation into Title VII" as prohibited by *Vickers*. *Id.* at 764.[7]

The Court agrees with Koren: homosexual males do not "*by definition*, fail to conform to the traditional gender norms" by changing their surname upon marriage. *Vickers*, 453 F.3d at 764 (emphasis added). And here, Koren chose to take his spouse's surname—a "traditionally" feminine practice—and his co-workers and superiors observed that gender non-conformance when Koren requested to be called by his married name. *Vickers* does "not suggest that [a plaintiff's] claim fails merely because he has been classified . . . as a homosexual. Rather, [the] claim fails [when the plaintiff] has failed to allege that he did not conform to traditional gender stereotypes in any observable way at work." *Vickers*, 453 F.3d at 764.

Koren has alleged just such a failure to conform. And he says that Miceli "harbored ill-will" because he changed his name but that she would not have done so if a female employee had changed

---

[7]Ohio Bell correctly points out that "[u]nder Title VII, sexual orientation is not a prohibited basis for discriminatory acts." *Gilbert v. Country Music Ass'n, Inc.*, 432 F. App'x 516, 519 (6th Cir. 2011) (internal quotation marks omitted); *see also Cooke v. SGS Tool Co.*, No. 19675, 2000 WL 487730, at *3 (Ohio Ct. App. Apr. 26, 2000) (Ohio anti-discrimination laws "do not extend to sexual orientation."). But in its motion for summary judgment, Ohio Bell doesn't argue that it ever *did* discriminate against Koren because he is homosexual. Ohio Bell may, of course, make that argument to the jury at trial.

-9-

Case No. 1:11-CV-2674
Gwin, J.

her name. Koren testified that Miceli refused to call him by his married name, that Miceli went out of her way to call him by his previous last name, and that Miceli informed him that she did not recognize same-sex marriages. *See* [Doc. 24-1 at 12-13]. (Miceli denies those ill-will allegations. *See* [Doc. 27-2 at 21-22].) And that ill-will, Koren says, resulted in seven unexcused absences and, ultimately, his termination. Accordingly, there is a "genuine dispute as to [] material fact[s]," Fed. R. Civ. P 56(a), and summary judgment is inappropriate on Koren's sex-stereotype theory.

2. Legitimacy and Pretext

Ohio Bell next argues, based on the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) three-step burden-shifting framework, that it terminated Koren for a "legitimate, nondiscriminatory reason": his seven unexcused absences.[8] [Doc. 25 at 16-17]. As Ohio Bell argues, Koren's nine missed days legitimately resulted in the seven unexcused absences, in conformance with the Collective Bargaining Agreement. [Doc. 29 at 9].

In response, Koren argues that his seven unexcused absences (to be with his dying father) are a pretext for gender discrimination. "Especially relevant to [a showing of pretext] would be evidence that [other] employees [incurring absences due to family deaths] were nevertheless retained." *McDonnell Douglas*, 411 U.S. at 804. And according to Moughan, in the past, Ohio Bell had flexibly applied the Collective Bargaining Agreement for employees in special situations, and leave of absences had been allowed without being credited unexcused absences. [Doc. 27-4 at 8-9]. Moughan testified that "over the fifteen years and the forty-three years [she'd] been a steward . . .

---

[8] "This framework first requires that the plaintiff establish a prima facie case. Once a prima facie case has been shown, the plaintiff is entitled to a presumption that the defendant discriminated against him or her in violation of Title VII. The defendant then bears the burden of production to put forth a legitimate, nondiscriminatory reason for the complained of adverse treatment. . . . [T]he plaintiff then needs to show that the defendants legitimate nondiscriminatory reason was a pretext for discrimination." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706-07 (6th Cir. 2006) (internal citations and quotation marks omitted).

Case No. 1:11-CV-2674
Gwin, J.

she had never seen this kind of a reaction to someone with a dying parent." [*Id.* at 8]. Koren also claims that another Ohio Bell employee "was told that he could have unlimited time off" for funeral leave when his girlfriend died. [Doc. 24-1 at 23].[9/] Miceli disagrees with these contentions and says that she "had to go by the contract." [Doc. 27-2 at 42].

"Other evidence that may be relevant to any showing of pretext includes facts as to [Ohio Bell's] treatment of [Koren] during his prior term of employment." *McDonnell Douglas*, 411 U.S. at 804. And Koren's facts indicate he was treated poorly due to his failure to conform to gender norms.

Accordingly, there are sufficient facts to support Koren's contention that Ohio Bell's proffered legitimate, nondiscriminatory reason for firing him was a pretext for discriminating against him for failure to conform to gender norms; Ohio Bell is not entitled to judgment on Koren's gender discrimination claims.

**IV.**

For the foregoing reasons, the Court **DENIES** Ohio Bell's motion for summary judgment.

IT IS SO ORDERED.

Dated: August 14, 2012                     s/     *James S. Gwin*
                                           JAMES S. GWIN
                                           UNITED STATES DISTRICT JUDGE

---

[9/]In addition, there is evidence in the record that Moughan had, at some point, come to an agreement that Koren would only be credited three unexcused absences, allowing him to be converted rather than terminated. However, Ohio Bell challenges this evidence's admissibility. [Doc. 29 at 11]. If this action proceeds to trial, the admissibility of this evidence will need to be determined. However, for the purposes of this motion, the Court has no need to consider this information because other evidence is sufficient to show genuinely disputed material fact concerning whether Ohio Bell's reason for termination was pretext.

-11-